**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| A AVENTURA CHIROPRACTIC CARE CENTER, INC., a Florida corporation, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 15-CV-20137-UU |
| v. | ) ) ) | |
| BB FRANCHISING LLC and JOHN DOES 1-10, | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S MOTION AND INCORPORATED MEMORANDUM OF LAW**
**IN SUPPORT OF CLASS CERTIFICATION**

Plaintiff, A Aventura Chiropractic Care Center, Inc., individually and on behalf of all others similarly situated, hereby moves the Court for class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and states the following in support:

1.      This case arises out of a fax-advertising campaign wherein facsimile advertisements were sent to Plaintiff and the proposed class on August 9, 2011, September 20, 2011, and December 6, 2011.

2.      Plaintiff, a Florida corporation with its principal place of business in Aventura, received fax advertisements on all of the aforementioned dates and brought this lawsuit alleging that the faxes violated the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227.

3.      Each of the faxes advertised products sold by Defendant BB Franchising LLC ("Defendant" or "Brain Balance"). A total of 49,371 fax advertisements were successfully sent to fax numbers purchased from list provider FaxVantage and sent by fax broadcaster ProFax, Inc. ("ProFax") on behalf of Defendant.

**Precise Relief Requested**

4.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff seeks an Order

from this Court certifying the following class:

> All persons who were sent one or more facsimiles on or about August 9, 2011,
> September 20, 2011, or December 6, 2011, by or on behalf of "Brain Balance"
> describing an opportunity to become a "Brain Balance" franchisee and stating,
> "To opt out from future faxes go to www.removemyfaxnumber.com enter PIN#
> 15801, or call 877-284-7885" and "The recipient may make a request to the
> sender not to send any future faxes and that failure to comply with the request
> within 30 days is unlawful."

5.      Plaintiff also seeks an Order from the Court appointing Plaintiff as class

representative and appointing the law firm of Anderson + Wanca as class counsel.

**Basis of the Relief Requested**

6.      As explained in Plaintiff's incorporated Memorandum of Law, Plaintiff easily

satisfies the requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3), and the Class is

ascertainable. Plaintiff seeks to certify a class of all those persons who were sent some or all of the

same three faxes in violation of the TCPA and its implementing regulations. It is undisputed these

faxes were sent by fax broadcaster ProFax, and that the faxes are advertisements. Invoices from

ProFax show the aforementioned three fax broadcasts resulted in 49,371 error-free transmissions.

Furthermore, the affirmative defenses of established business relationship ("EBR") or "prior express

invitation or permission" are unavailable because none of the faxes have an opt-out notice that

complies with the regulations implementing the TCPA. Finally, Plaintiff submits that its counsel, the

law firm of Anderson + Wanca, is highly experienced in TCPA class-action litigation and should be

appointed class counsel under Rule 23(g), and Plaintiff should be appointed class representative, as it

has no conflicts and will actively and adequately prosecute this action.

## MEMORANDUM

### I.    Introduction

The TCPA, 47 U.S.C. § 227(b)(1)(C), forbids the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless certain exceptions are met. The TCPA defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* § 227(a)(5). The TCPA creates a private right of action for any person that receives an advertisement in violation of the statute or the implementing regulations and provides for minimum statutory damages of $500 for each violation as well as injunctive relief against future violations. *Id.* § 227(b)(3)(A)–(B). Additionally, the TCPA provides treble damages may be assessed if in the Court's discretion the defendant "willfully or knowingly" violated the Act. *Id.* § 227(b)(3).

The Federal Communications Commission ("FCC") has authority to prescribe regulations to implement the TCPA. *Id.* § 227(b)(2); *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012) (the Act directs the FCC to prescribe implementing regulations). Under that authority, the FCC has issued regulations requiring specific "opt-out" notice on fax advertisements in order to advise recipients of how to stop receiving such faxes. 47 C.F.R. § 64.1200(a)(4)(iii). The FCC's regulations are clear that fax advertisements sent pursuant to an EBR or with "prior express invitation or permission" must contain compliant opt-out notice. *Id.* § 64.1200(a)(4)(iii)–(iv).

Defendant, through fax broadcaster ProFax, conducted three fax broadcasts in 2011, wherein Defendant sent 49,371 fax advertisements to fax numbers provided by FaxVantage, including three to Plaintiff's fax number. It is undisputed the faxes are advertisements under the TCPA; it is clear Defendant is a "sender" pursuant to the regulations implementing the TCPA; and

3

it cannot be genuinely disputed the three faxes at issue do not have an opt-out notice that complies with the FCC's regulatory requirements.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff seeks certification of the class of persons to whom the advertisements were sent by fax. As the Seventh Circuit held in *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 683 (7th Cir. 2013), "[c]lass certification is normal in litigation under § 227 [the TCPA], because the main questions, such as whether a given fax is an advertisement, are common to all recipients." This case is no exception. As argued below, the requirements of Rule 23(a) and 23(b)(3) are easily satisfied under the facts of this case. Plaintiff requests that the Court certify the class, appoint Plaintiff as the class representative, and appoint Plaintiff's counsel as class counsel.

## II.   Factual Background[1]

### A.   Brain Balance and Diamond Financial enter into Broker Agreement.

Brain Balance is a Delaware limited liability company. (Miller Dep. Tr. at 8). Brain Balance licenses franchises to run Brain Balance Achievement Centers. (*Id.* at 10). Brain Balance operates

---

[1] Copies of the following are attached to the Appendix of Exhibits: Deposition of Donald Johnson (May 21, 2015) ("Johnson Dep. Tr."), Exhibit 1; Deposition of Leonard Stein (May 22, 2015) ("Stein Dep. Tr."), Exhibit 2; Deposition of Andrew Barnett (May 20, 2015) ("Barnett Dep. Tr."), Exhibit 3; Facsimile Advertisement sent August 9, 2011 ("August 9 Fax"), Exhibit 4; Facsimile Advertisement sent September 20, 2011 ("September 20 Fax"), Exhibit 5; Facsimile Advertisement sent December 6, 2011 ("December 6 Fax"), Exhibit 6; ProFax Invoice, dated August 9, 2011 ("ProFax August 9 Invoice"), Exhibit 7; ProFax Invoice, dated September 20, 2011 ("ProFax September 20 Invoice"), Exhibit 8; ProFax Invoice, dated December 6, 2011 ("ProFax December 6 Invoice"), Exhibit 9; Broker Agreement between Brain Balance and Diamond Financial, dated January 5, 2011 ("Broker Agreement"), Exhibit 10; FaxVantage Invoices, Exhibit 11; Deposition of Charles "Chip" Miller (May 27, 2015), ("Miller Dep. Tr."), Exhibit 12; Declaration of David Muransky ("Muransky Decl."), Exhibit 13; Email from William Fowler to Don Johnson, Janet Diaz and Zee Krell, dated March 6, 2011 ("March 6 email"), Exhibit 14; Email from William Fowler to Don Johnson and Janet Diaz, dated April 14, 2011 ("April 14 email"), Exhibit 15; Resumes for Plaintiff's counsel, Group Exhibit 16; Subpoena to ProFax, Inc. ("ProFax Subpoena"), Exhibit 17; Email from William Fowler to Don Johnson and Janet Diaz, dated April 14, 2011 ("Second April 14 email"), Exhibit 18.

nationwide and currently licenses approximately sixty-eight franchises. (*Id.*) Charles "Chip" Miller ("Miller") is the Chief Executive Officer of Brain Balance. (*Id.* at 12).

Diamond Financial is a small-business finance specialist, assisting small businesses who cannot obtain financing to open their businesses. (Johnson Dep. Tr. at 11). It is incorporated in New Jersey. (*Id.* at 7). Don Johnson ("Johnson") is the owner of the Diamond Financial office located in New Jersey. (*Id.* at 7, 8).

On January 5, 2011, Brain Balance entered into a Broker Agreement with Diamond Financial. (*Id.* at 21, 22, 27). The Broker Agreement provided in part as follows:

> During the term of this Agreement, Diamond Financial Services will provide to Brain Balance Center contacts with potential and prospective purchasers of Company's franchise or business opportunity. The potential customer must be identified in writing via email, fax, U.S. mail or express delivery. The sale or license of a franchise within eighteen (18) months of identification will automatically qualify the potential customer as Referred Customer.

(Broker Agreement, ¶ 2). Pursuant to the terms of the Broker Agreement, Diamond Financial was entitled to a one time commission of $13,000 for leads it "solely and exclusively generated," and $11,000 for leads in which Brain Balance (and Janet Diaz) assisted, if the lead became a Brain Balance franchisee. (*Id.* at ¶ 3; Johnson Dep. Tr. at 34–36). The Broker Agreement was executed by William Fowler ("Fowler") on behalf of Brain Balance and Johnson on behalf of Diamond Financial. (Broker Agreement at 2).

**B.      In order to market Brain Balance franchises, Diamond Financial purchases fax lists to send fax advertisements.**

Leonard Stein ("Stein") owns a company called L. Stein Company, Inc., which does business as FaxVantage. (Stein Dep. Tr. at 6). FaxVantage is in the business of selling marketing data, including fax data. (*Id.* at 7). Johnson was familiar with FaxVantage and Stein. (Johnson Dep. Tr. at 25). Johnson told Brain Balance he was going to purchase lists to market Brain Balance by fax. (*Id.* at 87). Johnson bought lists of fax numbers from FaxVantage in order to send the Faxes. (Johnson

Dep. Tr. at 48; FaxVantage Invoices). The FaxVantage invoices state, and Johnson testified, that the FaxVantage fax lists were emailed to Johnson. (Johnson Dep. Tr. at 54, 58).

FaxVantage provided the fax lists purchased by Diamond Financial in an Excel spreadsheet. (Stein Dep. Tr. at 14). FaxVantage's database is based on the standard industrial code (SIC) – every business, organization or profession has a six digit code. (*Id.* at 15). When FaxVantage receives a request for data, it looks up the corresponding SIC code and identifies the records responsive to the request. (*Id.*) Thus, the first of the FaxVantage Invoices, dated March 25, 2015, requested a business fax list of ophthalmologists nationwide. (FaxVantage Invoice at 1). FaxVantage bills at 80% of the number of records requested. (Stein Dep. Tr. at 16). For example, as to the first FaxVantage Invoice, 9,041 fax numbers were provided, but the quantity billed in 80% of that number, or 7,000. (Stein Dep. Tr. at 16, 17; FaxVantage Invoice at 1).

As to all the fax data provided to Diamond Financial, no one at FaxVantage ever called any of the companies asking for permission for anyone to send them an advertisement by fax, nor did anyone at Diamond Financial make such a request. (Stein Dep. Tr. at 27, 28).

Finally, Johnson testified he no longer has the fax lists provided by FaxVantage. (Johnson Dep. Tr. at 54).

**C.      Diamond Financial hires fax broadcaster ProFax to send Brain Balance's fax advertisements.**

ProFax "disseminates information," including information by fax. (Barnett Dep. Tr. at 5, 6). Andrew Barnett ("Barnett") is the Vice President of ProFax and has been for over thirteen years. (*Id.* at 5). Barnett was Johnson's contact at ProFax. (Johnson Dep. Tr. at 59). The faxes at issue in this case were sent on August 9, 2011 ("August 9 Fax"), September 20, 2011 ("September 20 Fax"), and December 6, 2011 ("December 6 Fax") (collectively, the "Faxes"). Johnson used ProFax to transmit the Faxes. (Johnson Dep. Tr. at 43, 57-58).

6

When Diamond Financial ordered a fax broadcast, it supplied ProFax with a fax list and an image to be faxed. (Barnett Dep. Tr. at 17; Johnson Dep. Tr. at 58-60). ProFax never changed, altered, or modified the fax lists or images provided by Diamond Financial, nor were they ever instructed by anyone at Diamond Financial to seek permission to send fax advertisements. (Barnett Dep. Tr. at 18). When ProFax completes a fax broadcast for a client, the ProFax system automatically generates and sends by two separate emails: an invoice and a fax report. (Barnett Dep. Tr. at 24). The fax report contains what is typically called a fax log or transmission report, which represents the final results of the fax broadcast. (*Id.* at 26). The fax report (attached as an email), typically contains the fax numbers the report (image) was sent to, the date, the time, the duration, how many pages were delivered, and other information that was provided to ProFax. (*Id.* at 27). The report would contain, and ProFax software records, how many transmissions were successful and how many transmissions were unsuccessful. (*Id.* at 28).

Johnson testified that following each fax broadcast, ProFax sent via email an invoice for the fax broadcast and report fax logs stating how many faxes were sent and how many "went through." (Johnson Dep. Tr. at 70). Johnson stated he initially saved the fax logs but eventually discarded them and never printed the fax logs out. (*Id.*)

The August 9 ProFax Invoice provided that a total of 28,072 fax transmissions were attempted of which 21,123 were successful and 6,949 were unsuccessful. (August 9 ProFax Invoices). The September 20 ProFax Invoice provided that a total of 28,072 fax transmissions were attempted of which 20,732 were successful and 7,340 were unsuccessful. (September 20 ProFax Invoice). The December 6 ProFax Invoice provided that 12,095 fax transmissions were attempted of which 7,516 were successful and 4,579 were unsuccessful. (December 6 ProFax Invoice).

In sum, a total of 49,371 faxes were successfully transmitted (21,123 + 20,732 + 7,516).

Johnson testified he did not instruct anyone at ProFax to call any of the companies on the target list to seek permission before sending a fax advertisement. (Johnson Dep. Tr. at 68). Johnson testified he never looked up the owners of the fax numbers on the FaxVantage lists to call to ask permission to send the Faxes on behalf of Brain Balance. (*Id.* at 62).

   **D.     The Faxes.**

The August 9 Fax asks, "Are you ready to benefit from your Healthcare Experience?," describes an "Ideal Franchise Opportunity for Healthcare Professionals who Want Personal as well as financial satisfaction," and states, "For more information about how to take advantage of this opportunity, contact Don Johnson at 888-875-6228 or email djohnson@BrainBalanceCenters.com." (August 9 Fax). The September 20 Fax asks, "Thinking of diversifying your services and adding a new Income Stream?," promotes an "Ideal Franchise Opportunity in the Booming Private Sector," and states, "For more information about how to take advantage of this opportunity, contact Don Johnson at 888-875-6228 or email djohnson@BrainBalanceCenters.com." (September 20 Fax).

The December 6 Fax asks, "Interested in a more rewarding business venture?," advises the recipient to "Make an investment that Makes a Difference," states, "Brain Balance franchises allow you to utilize your professional experience, maintain your current practice, and embark on a more rewarding business venture with greater financial independence" and "We provide the training, business savvy and marketing tools that enable you to succeed in this new dynamic industry and . . . no insurance collections, no headaches," and states, "Contact Don Johnson at 888-876-6228 or email djohnson@brainbalancecenters.com." (December 6 Fax).

   All three Faxes contain the Brain Balance logo and the following opt-out notice:

> To opt out from future faxes go to www.removemyfaxnumber.com enter PIN# 15801, or call 877-284-7885. The recipient may make a request to the sender not to send any future faxes and that failure to comply with the request within 30 days is unlawful.

(August 9 Fax, September 20 Fax, December 6 Fax). The opt-out notice does not (1) provide a

domestic facsimile number for opt-out requests, (2) state that the recipient must use the means identified in the fax to make an enforceable request, or (3) state that if the recipient subsequently gives "prior express invitation or permission" the opt-out request is revoked.

### E.   Brain Balance was aware of and participated in the fax advertising campaign, including approval and additions to the content of the faxes.

Johnson acted as a marketer for Brian Balance. Johnson's main contacts at Brain Balance were Janet Diaz ("Diaz") and Fowler – Johnson communicated with Fowler mostly by email. (Johnson Dep. Tr. at 28). The content for the Faxes came from Brain Balance. (*Id.* at 40, 41). Johnson testified Brain Balance approved the content of the Faxes before they were sent and that he (Johnson) would not send out anything, including the Faxes, which had not been reviewed by Brain Balance (*Id.* at 41, 46, 75).

Johnson testified Diaz and Fowler knew Diamond Financial was marketing Brain Balance by fax (among other methods) because Johnson discussed the fax marketing with them, as was reflected in emails between them. (*Id.* at 42, 44-45; March 6 email; April 14 email; April 14 email II). In an email dated April 14, 2011, sent from Fowler to Johnson and Diaz, Fowler expressly referenced "fax ads," proposing questions to be put at the top of the fax ads. (April 14 email). In an earlier email, Fowler stated in part: "[h]ere is the copy for the email and fax ads." (March 6 email). And in a second email on April 14, Fowler responds to questions raised by Johnson regarding finalization of "the fax broadcast page." (Second April 14 email, at 2). Johnson further testified he had discussions with Diaz and Fowler regarding the faxes to be sent. (Johnson Dep. Tr. at 75).

Miller, Brain Balance's Rule 30(b)(6) deponent, testified Brain Balance knew that Johnson was attempting to generate leads by fax for Brain Balance and "it appeared" Brain Balance approved the content of the Faxes. (Miller Dep. Tr. at 21, 22, 37, 38). Finally, Miller testified that the August 9 Fax, the September 20 Fax, and the December 6, 2011 "appear" to market a franchise opportunity for a Brain Balance Center. (*Id.* at 47).

III.   <u>**Governing Substantive Law**</u>

The TCPA generally forbids the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," 47 U.S.C. § 227(b)(1)(C), and provides for statutory damages of $500 for each violation, which the Court may treble to $1,500 if a sender's violation was "willful" or "knowing." *Id.* § 227(b)(3)(A)-(B). The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* § 227(a)(5). The "sender" of an unsolicited fax is defined by FCC regulations as any "person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10).

There is only one statutory exception to TCPA liability. The exception has three elements: (1) the sender has an EBR with the recipient; (2) the sender obtained the recipient's fax number either through a voluntary communication between the two or through a public source on which the recipient voluntarily made the number available; and (3) the fax has an opt-out notice meeting the requirements of the statute. The statute directs the FCC to "prescribe regulations to implement" the opt-out notice requirement. The corresponding FCC regulation states an opt-out notice must:

(1)   Be clear and conspicuous and on the first page of the advertisement;

(2)   State that the recipient may make a request to the sender not to send any future unsolicited advertisements and that failure to comply within 30 days is unlawful;

(3)   Set forth the requirements for a request under 47 U.S.C. § 227(b)(2)(E); [2]

---

[2] 47 U.S.C. § 227(b)(2)(E) states that a request not to send future unsolicited advertisements will be binding only if (1) it identifies the telephone number or numbers of the telephone facsimile machine to which the request relates; (2) the request is made to the telephone or facsimile number of the sender; and (3) the person making the request has not "subsequent to such request" provided express invitation or permission to the sender.

(4) Include a domestic contact telephone and facsimile number for the recipient, and a cost-free mechanism for a recipient to transmit a request; and

(5) Permit the recipient to make such a request at any time on any day of the week.

47 C.F.R. § 64.1200(a)(4)(iii).

The text of the regulation states, "[a] facsimile advertisement that is sent to a recipient that has provided prior express invitation or permission to the sender must include an opt-out notice that complies with the requirements in paragraph (a)(4)(iii) of this section." 47 C.F.R. § 64.1200(a)(4)(iv). The FCC's 2006 order issuing the regulation states the regulation means what it says: the opt-out notice is required for all fax advertisements, even if there is an EBR or the sender has obtained prior express permission. *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, 71 Fed. Reg. 25967-01, 25972, 2006 WL 1151584 (May 3, 2006) ("In addition, entities that send facsimile advertisements to consumers from whom they obtained permission must include on the advertisements their opt-out notice and contact information to allow consumers to stop unwanted faxes in the future.").

On October 30, 2014, the FCC again reiterated that <u>all</u> fax advertisements, even those sent with prior express invitation or permission, are required to have an opt-notice that complies with regulatory requirements. *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005; Application for Review filed by Anda, Inc.; Petitions for Declaratory Ruling, Waiver, and/or Rulemaking Regarding the Commission's Opt-Out Requirement for Faxes Sent with the Recipient's Prior Express Permission*, CG Docket Nos. 02-278, 05-338, Order, FCC 14-164 (rel. Oct. 30, 2014) ("Opt-Out Order"), at ¶¶ 19–20. The FCC ruled that "substantial compliance" is not sufficient; "full compliance is required." *Id.* ¶ 33. The order also left undisturbed the FCC's 2006 ruling that "the burden of proof rests on the sender to demonstrate that permission was given" by "clear and convincing evidence" and so senders should "promptly document that they received such permission." 71 Fed. Reg. at 25972.

IV.   **Argument**

Plaintiff proposes the following class definition:

> All persons who were sent one or more facsimiles on or about August 9, 2011, September 20, 2011, or December 6, 2011, by or on behalf of "Brain Balance" describing an opportunity to become a "Brain Balance" franchisee and stating, "To opt out from future faxes go to www.removemyfaxnumber.com enter PIN# 15801, or call 877-284-7885" and "The recipient may make a request to the sender not to send any future faxes and that failure to comply with the request within 30 days is unlawful."

To achieve class certification, Plaintiff must first demonstrate the proposed class is "ascertainable and adequately defined." *C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 687–88 (S.D. Fla. 2014). Plaintiff must then demonstrate Rule 23(a)'s four prerequisites are satisfied: (1) the proposed class is so numerous joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims of the representative party are typical of the claims of the class; and (4) the representative party will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *see also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004)). In addition to satisfying the requirements of Rule 23(a), Plaintiff must satisfy one of the subsections of Rule 23(b), in this case (b)(3). *Id.*

Class actions promote judicial economy by aggregating small claims into one lawsuit. Further, "[c]lass actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually. [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum v. Shutts*, 472 U.S. 797, 808–09 (1985). In this case, as discussed below, the class is ascertainable, and the Rule 23(a) requirements are easily met. The Rule 23(b)(3) requirements of "predominance" and "superiority" are also satisfied. The common legal issues (such as whether the faxes are "advertisements" under the TCPA) "predominate," and there will be no class-member-specific issues for the Court to decide at trial. A class action is clearly "superior" because it would make no economic sense to bring an individual lawsuit for $500 to $1,500 in

statutory damages. For these reasons, as argued below, the Court should grant class certification.

A.    **The proposed class is ascertainable.**

A class must be "adequately defined and clearly ascertainable." *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, 2014 WL 7366255, at *4 (S.D. Fla. Dec. 24, 2014); *Randolph v. J.M. Smucker Co.*, 2014 WL 7330430, at *3 (S.D. Fla. Dec. 23, 2014) (citing *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1303-04 (11th Cir. 2012)). Ascertainability does not require class members be identified prior to class certification, but it requires they be identifiable with reference to objective criteria at some point through a "manageable process that does not require much, if any, individual inquiry." *Doctor Diabetic*, 2014 WL 7366255, at *4; *Randolph*, 2014 WL 7330430, at *3; *Bussey v. Macon County Greyhound Park, Inc.*, 562 Fed. App'x 782, 787 (11th Cir. 2014).

Several district courts in the Eleventh Circuit have approved TCPA classes of persons "sent" fax advertisements as ascertainable. *E.g.*, *C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 687–88 (S.D. Fla. 2014) (finding class "sent" fax advertisements "ascertainable and adequately defined"); *A Aventura Chiropractic Ctr., Inc. v. Med Waste Mgmt. LLC*, No. 12-21695-CIV, 2013 WL 2243972, at *7 (S.D. Fla. May 21, 2013) (same);[3] *cf. Doctor Diabetic*, 2014 WL 7366255, at *4 (modifying proposed "sent" class and certifying class of persons who "received" defendant's fax advertisements as ascertainable).

Regarding objective criteria for class-member identification, in most TCPA fax cases, the requirement is satisfied through fax-transmission logs, which show the telephone numbers to which the faxes were sent, the dates and times of transmission, and whether the transmissions were

---

[3] The first *Med Waste* decision denied class certification, reasoning that whether each class member had an EBR with the defendant or gave "prior express invitation or permission" predominated. 2013 WL 2243972, at *8. The court later reconsidered and certified a class based on the common issue of whether the faxes contained the opt-out notice required to assert either of these affirmative defenses. *A Aventura Chiropractic Ctr., Inc. v. Med Waste Mgmt. LLC*, No. 12-21695-CIV, 2013 WL 3463489, at *3 (S.D. Fla. July 3, 2013) (holding "the sole issue in ascertaining class membership is whether in solicited and unsolicited advertisements the required opt-out language was included").

successful. In *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th 2014), the Sixth Circuit held in a TCPA fax case that "the fax numbers are objective data satisfying the ascertainability requirement." Numerous district courts in the Eleventh Circuit have found the class ascertainable where the fax logs were available. *See C-Mart*, 299 F.R.D. at 687–88; *Doctor Diabetic*, 2014 WL 7366255, at *4.

Even where transmission logs are not available, however, district courts will still grant class certification. *Med Waste*, 2013 WL 2243972, at *7 (holding list of fax numbers was sufficient to ascertain the class for class certification). In *CE Design v. Beaty Constr., Inc.*, 2009 WL 192481, at *1, *3 (N.D. Ill. Jan. 26, 2009), the defendant lost or destroyed the list of numbers, and the defendant argued the class was not ascertainable. The district court disagreed, holding that, although there was no evidence the list was destroyed with "nefarious" purpose, a defendant cannot "escape liability simply by destroying the list of its victims." *Id.* at *3. In *Sadowski v. Med 1 Online, LLC*, 2008 WL 2224892, at *3 (N.D. Ill. May 27, 2008), the defendant argued "the list of specific fax numbers that received the faxes at issue no longer exists," and the court certified the class anyway, holding it "would be unfair to hold otherwise given that the missing list of recipients was last in Defendant's possession." *See also Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014) (holding it would be "fundamentally unfair to potential class members" to define the class according to "defendants' own recordkeeping," where class members could be asked to submit "their own sworn statements" or documentary evidence to show they received calls and denying certification "would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct").

In this case, Plaintiff subpoenaed ProFax, the fax broadcaster used to transmit the fax advertisements, on March 15, 2015. The subpoena seeks, among other things, "All documents, databases, telephone records, or computer records sufficient to identify or which may lead to the

14

identity of the fax numbers, names, and addresses of persons or entities to whom PROFAX, by or on behalf of DEFENDANT sent or caused to be sent any fax transmission for the period of January 14, 2011 to present, and whether the fax transmissions were successfully received." (ProFax Subpoena). ProFax responded producing invoices and removal numbers associated with Diamond Financial Services, but not transmission logs.

Plaintiff deposed ProFax's representative, Andrew Barnett, on May 20, 2015. Barnett testified that his obligation under the subpoena is still ongoing and is currently reviewing backup materials to produce the fax logs. (Barnett Dep. Tr. at 37). Additionally, Plaintiff may serve a subpoena on the telephone carrier for ProFax, Broadview Networks, seeking the call detail records for the dates in question in order to ascertain the class. Also, Plaintiff will continue to conduct further discovery into Diamond Financial's e-mail storage and retention policies, as Barnett testified the fax logs were sent to Johnson's e-mail account. (Barnett Dep. Tr. at 24). Therefore, there are many different ways that Plaintiff can easily ascertain the class by conducting further discovery.

Thus, this Court should either (1) hold the proposed class is ascertainable, even without the fax transmission records, or (2) "postpone" a ruling on class certification until fact discovery is completed, as contemplated by Local Rule 23.1(c).[4] In short, Plaintiff's proposed class is ascertainable.

**B.      Numerosity.**

The numerosity requirement of Rule 23(a)(1) is satisfied where "the class is so numerous that joinder of all members [of the Class] is impracticable." There is no exact number that a plaintiff needs to present to satisfy numerosity. *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D. Fla. 2003). The Eleventh Circuit has held that "less than twenty-one is inadequate, more than forty

---

[4] On April 20, 2015, this Court entered an order setting a deadline for all discovery to be completed by September 25, 2015. (Doc. 17).

adequate." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).

In this case, ProFax Invoices demonstrate Brain Balance sent 49,371 completed error-free fax transmissions. Joinder of this many class members is not feasible. Therefore, Rule 23(a)(1)'s numerosity requirement is satisfied.

### C.  Commonality.

To establish commonality, a movant must show that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). There need only be "at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009). The claims of class members need not be identical. *Stewart*, 669 F.2d at 335 (citing *Johnson v. Am. Credit Co.*, 581 F.2d 526, 532 (5th Cir. 1978)). Nor must common questions "predominate," as required under Rule 23(b)(3). *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009). It merely requires "one issue" of fact or law that can be decided classwide. *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 313 (S.D. Fla. 2001). Commonality is generally met where a defendant has engaged in a course of conduct that is standardized across the class. *Id.*

Here, Brain Balance engaged in standardized conduct involving a common nucleus of operative facts by faxing the same advertisement to Plaintiff and the rest of the class. Indeed, it is undisputed that ProFax sent the faxes on August 9, September 20, and December 6, 2011, to fax numbers purchased from FaxVantage, and that the faxes are advertisements. Each class member was treated exactly the same, having been sent one or more of the three faxes that are the subject of this Motion, giving rise to common factual issues, such as the content of the faxes, how many were sent, and when they were sent.

The common legal questions presented under the TCPA include the following:

(1)   Whether the three faxes constitute "advertisements";

(2)   Whether the fax advertisements contained a proper opt-out notice;

16

(3)     Whether Brain Balance meets the definition of "sender" for direct TCPA liability, meaning a "person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement," 47 C.F.R. § 64.1200(f)(10);

(4)     Whether Plaintiff and other class members are entitled to statutory damages; and

(5)     Whether Brain Balance's acts were "willful" or "knowing" under the TCPA and if so whether the Court should treble the statutory damages.

Any one of these issues can be resolved in one fell swoop as to the entire class. Therefore, the "commonality" requirement of Rule 23 is satisfied.

**D.     Typicality.**

To satisfy Rule 23(a)(3)'s typicality requirement, a plaintiff must possess the same interest and have suffered the same injury as the other class members. *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). Typicality can be satisfied even if substantial factual differences exist between the plaintiff and the other class members if there is a "strong similarity of legal theories." *Id.* Typicality is present if "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).

Typicality is satisfied in this case because each of the class members was subjected to the same conduct, *i.e.*, Defendants' fax-advertising campaign. Plaintiff and each member of the class received the same fax advertisement and each class member's claim is based on the same legal theory as Plaintiff's. *See Doctor Diabetic*, 2014 WL 7366255, at *6 (typicality satisfied because plaintiff received same fax as the rest of the class, and his case raised same factual and legal questions).

**E.     Adequacy of representation.**

**1.     Rule 23(a)(4)'s adequacy requirement.**

In examining adequacy of the class representative, the court examines "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the

representatives will adequately prosecute the action." *Doctor Diabetic*, 2014 WL 7366255, at *7. As noted above, Plaintiff's claim is identical to the claims of the other class members, making its interests aligned with the other class members' interests. Plaintiff is a Florida corporation that operates a chiropractic facility in Aventura, Florida. (Muransky Decl. at ¶ 3). On or about August 9, 2011, September 20, 2011, and December 6, 2011, Plaintiff received a junk fax on its fax machine at the number (305) 682-8347. (*Id.* at ¶ 4). Plaintiff has owned and maintained this fax number and fax machine at all relevant times. (*Id.*) Plaintiff did not give permission for any of the defendants to send these junk faxes to Plaintiff's fax number. (*Id.* at ¶ 5).

Plaintiff authorized the filing of this lawsuit in the Southern District of Florida as a result of its receipt of these junk faxes. (*Id.* at ¶ 6). Plaintiff understands its obligations and the nature of the claims in this case. (*Id.* at ¶ 7). Plaintiff is seeking a claim under the TCPA to certify a class of all persons who were sent faxes from the Defendants advertising their products. (*Id.*). Plaintiff has been actively involved in this litigation and is in the process of answering written discovery. (*Id.* at ¶ 8). Plaintiff is willing to do whatever is necessary to protect the interests of the absent class members and is unaware of any conflicts of interest with any class members. (*Id.* at ¶ 9, 10). Therefore, Rule 23(a)(4)'s adequacy requirement is satisfied.

### 2.      Rule 23(g)'s adequacy of class counsel requirement.

Plaintiff's counsel are well qualified to represent the Class. In determining whether counsel are qualified, Rule 23(g) lists four factors for the Court to consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

Here, Plaintiff's counsel are experienced lawyers who are clearly qualified to act as counsel for the class. Resumes for Plaintiff's counsel are attached as <u>Group Exhibit 16</u>. They have been appointed lead or co-lead counsel in many contested class actions and have recovered substantial funds for their clients and class members. They have been litigating TCPA claims for many years and have negotiated class-wide settlements in many cases. Plaintiff's counsel have allocated and will continue to commit adequate resources, both staffing and monetary, to ensure that the class is properly represented in this case.

### F.    The Rule 23(b)(3) requirements are satisfied.

To certify a class, a plaintiff must also satisfy one of the subsections of Rule 23(b). *Cheney*, 213 F.R.D. at 489. Here, Plaintiff seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

### 1.    Predominance.

The predominance inquiry of Rule 23(b)(3) is more demanding than Rule 23(a)'s commonality requirement. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623-34 (1997). In the context of Rule 23(b)(3), issues which are subject to generalized proof must predominate over issues that are subject only to individualized proof. *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989) (quoting *Nichols v. Mobile Bd. Of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982)). In determining whether common questions predominate under Rule 23(b)(3), courts "generally focus on whether there are common liability issues which may be resolved efficiently on a class wide basis." *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 606 (S.D. Fla. 2003).

In this case, common legal issues predominate because the class members' claims arise under a single federal statute. Those questions—*e.g.*, whether the faxes meet the definition of

19

"advertisement," whether Defendants meet the definition of "sender," and whether the opt-out notice was deficient—are common to the entire class. Since each class member was sent the same faxes, there are no individualized questions that would vary class member by class member. As discussed above, the affirmative defenses of EBR and permission are unavailable in light of the non-compliant opt-out notice. Therefore, Rule 23(b)(3)'s predominance requirement is satisfied.

2.       **Superiority.**

Finally, Rule 23(b)(3) requires that a class action be the superior method for adjudicating the claims. Certifying a class is the superior way to adjudicate claims when a "class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615. In *Amchem*, the Supreme Court noted one of the purposes underlying Rule 23(b)(3) was "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Id.* at 617.

From the perspective of both the Court and the class members, a class action is superior to individual actions for TCPA violations because the ordinary statutory damages are only $500 and the TCPA does not allow for shifting of attorney fees. *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 753 (2012) (noting that nearly all TCPA cases are brought as class actions because the relatively low statutory damages do not justify individual suits).

Dated: May 29, 2015                         Respectfully submitted,

                          By:    s/Ryan M. Kelly
                                 Counsel for Plaintiff

                                 Brian J. Wanca
                                 Ryan M. Kelly (Florida Bar No. 90110)

20

ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
Facsimile: (847) 368-1501
rkelly@andersonwanca.com


**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on May 29, 2015 the foregoing brief was served upon all counsel of record by the ECF system.


s/Ryan Kelly